IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JEROME ANDREW DICKERSON,        )
                                )
            Petitioner,         )
                                )
    v.                          )    1:21CV149
                                )
ERIK HOOKS,                     )
                                )
            Respondent.         )

ORDER AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Petitioner Jerome Andrew Dickerson, a prisoner of the State of North Carolina, brings a Petition [Doc. #1] seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On July 27, 2006, in the Superior Court of Forsyth County, North Carolina, Petitioner was convicted by a jury of first-degree murder, as well as other charges. (Petition, §§ 1, 2, 5, 6.) He received a sentence of life without parole for the murder charge. (Id., § 3.) Petitioner pursued an unsuccessful direct appeal before filing a Motion for Appropriate Relief in the trial court (id. § 11(a)) and, after that Motion was denied, a petition for certiorari with the North Carolina Court of Appeals which was denied on February 16, 2021 (id., Attachs.). Petitioner thereafter filed his Petition in this Court. Respondent opposes the Petition with a Motion for Summary Judgment [Doc. #11] to which Petitioner responded with a Cross Motion for Summary Judgment [Doc. #16]. Petitioner also later filed a Motion [Doc. #18] seeking to amend his Cross Motion to include certain exhibits that were part of the MAR proceeding in state court. The Court will grant that Motion to Amend and has considered Petitioner's amended filing.

Respondent filed a Response [Doc. #19] to the Cross Motion, Petitioner filed a Reply [Doc. #20], and the Parties' Summary Judgment Motions are now before the Court.

<u>Petitioner's Claims</u>

Petitioner lists only a single ground for relief in his Petition, contending that he received ineffective assistance of counsel because his trial attorney did not properly investigate his case. (Petition, § 12, Ground One.) He does not further describe those claims on the petition form, but does so in a Supporting Memorandum [Doc. #1-1]. Petitioner contends first that his attorney failed to properly investigate the lighting and visibility conditions at the scene of the crime to determine that the State's chief witness could not have seen the murder as he claimed, and second that counsel failed to properly investigate the plausibility of the State's theory that Petitioner killed the victim in the case because he mistook him for Joe Martin, a person with whom Petitioner had a longstanding disagreement.

<u>AEDPA Standards of Review</u>

In considering Petitioner's contentions, the Court must apply a highly deferential standard of review in connection with habeas claims "adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d). More specifically, the Court may not grant relief unless a state court decision on the merits "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Id.</u> "Clearly established Federal law" includes only "'holdings, as opposed to the dicta,'" of the United States Supreme Court. <u>White v. Woodall,</u> 572 U.S. 415, 419 (2014) (quoting <u>Howes v. Fields,</u> 565 U.S. 499, 505 (2012)). A state court

2

decision is "contrary to" United States Supreme Court precedent if the state court decision either "arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a question of law" or "confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme] Court and nevertheless arrives at a result different" from the United States Supreme Court. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision involves an "unreasonable application" of Supreme Court case law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407; see also id. at 409–11 (explaining that "unreasonable" does not mean merely "incorrect" or "erroneous"). "[E]ven 'clear error' will not suffice." White, 572 U.S. at 419 (citing Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003)). "Rather, 'as a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Id. at 419-420. (quoting Harrington v. Richter, 562 U.S. 82, 103 (2011)). Finally, this Court must presume state court findings of fact correct unless clear and convincing evidence rebuts them. 28 U.S.C. § 2254(e)(1).

Here, Petitioner raised the substance of his claims in his Motion for Appropriate Relief and they were considered and denied by the state trial court in a detailed opinion that followed discovery and an evidentiary hearing. (Petition, Ex. 13 [Doc. #1-14].) This decision is entitled to the deferential standard set out above. Petitioner contends that the state MAR court made an unreasonable application of clearly established federal law by holding that counsel

3

performed reasonable investigations concerning the crime scene and the State's theory of the case.

Basic Facts

The basic facts of the case as evidenced at Petitioner's trial and set out in the opinion of the North Carolina Court of Appeals on direct review are as follows:

> On the night of 18 July 2003 and the early morning of 19 July 2003, Jerome Dickerson (defendant) was spending time with two friends, Tyrone Davis and Stephon Walker, smoking marijuana and driving around. The trio broke into Larry Swartz's cars and garage, stealing a number of items including a cell phone, stereo, jewelry, a leaf blower, and assorted tools. The three also stole two cars and a motorcycle from John and Tammy Lugin.
>
> Driving in one of the stolen cars, a Ford Explorer, they went to buy more marijuana. Davis exited the car to effectuate the purchase. Returning from that errand, he observed the Explorer stop near a pedestrian, and then watched as defendant pulled out a gun and shot the pedestrian, Willie Mack Johnson (the victim) in the chest.
>
> The trio then went to defendant's house, left for a while, and returned once again. On their return, they hid in the attic from the police. However, one of the three fell through the roof and had to be pushed back up. They subsequently fled through a window. Davis was later apprehended as he removed a gun (not the murder weapon) from the crawl space under defendant's house. All three were eventually taken into custody by the police.

State v. Dickerson, COA 07-14, 188 N.C. App 166 at *1 (N.C. Ct. App. Jan. 15, 2008). Most of these facts were based on the testimony of Tyrone Davis at Petitioner's trial.

Discussion

As stated earlier, Petitioner's claims involve allegations of ineffective assistance of counsel. In order to prove ineffective assistance of counsel generally, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second, that he was prejudiced by this performance. See Strickland v.

4

Washington, 466 U.S. 668 (1984). With respect to the first prong of Strickland, a petitioner bears the burden of affirmatively showing deficient performance, that is, that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. See Spencer v. Murray, 18 F.3d 229, 233 (4th Cir. 1994). In considering such a contention, the Court reviews counsel's conduct with a "deferential eye" and "presume[s] that challenged acts are likely the result of a sound trial strategy." Id. With respect to the second prong of Strickland, to show prejudice the petitioner must establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. (internal quotation omitted). Unsupported, conclusory allegations do not entitle Petitioner to even a hearing. Where, as here, a petitioner alleges ineffective pretrial investigation by counsel, the Court must "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' Strickland, 466 U.S., at 688, 104 S. Ct. 2052, which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,' id., at 689, 104 S .Ct. 2052 ('[E]very effort [must] be made to eliminate the distorting effects of hindsight')." Wiggins v. Smith, 539 U.S. 510, 523 (2003).

Petitioner's first claim is that Petitioner's original trial counsel failed to properly investigate the crime scene because he did not visit the crime scene at the time of night when the shooting allegedly occurred. At the evidentiary hearing for Petitioner's Motion for Appropriate Relief, Petitioner presented affidavits from Dorothy Ducksworth and her grandson, Christopher Marsh, who lived across the street from church parking lot where the murder occurred. Marsh was age 13 at the time. In her affidavit, Ducksworth states that at

5

about 4:00 to 4:30 a.m. on the morning of the murder she heard two gunshots outside her house and that she recalls the approximate time because she was concerned due to the fact that her grandson had not yet come home. (Petitioner's Motion to Amend, Ex. 21 [Doc. #18-4 at 16-17], Ducksworth Aff. ¶ 3.) She later got up to get dressed for work at 5:00 a.m. as she always does. (Id. ¶ 4.) When it got light outside, she saw a man lying in the church parking lot across the street from her house, which caused her to call the police. (Id. ¶ 5.) After she learned the man was dead, police talked to her and she told them she heard the shots earlier, although she does not recall what time she told them she heard the shots. (Id. ¶ 6.) Her grandson, Marsh, states that on the same morning, he was returning to Ducksworth's house while it was still dark and that he saw a man lying in the church parking lot. (Petitioner's Motion to Amend, Ex. 22 [Doc. #18-4 at 18-19], Marsh Aff. ¶ 5.) He believed the man to be passed out drunk and continued home before going to bed. (Id.) His grandmother woke him after sunrise and he learned that the man was dead. (Id. ¶ 6.) He was not interviewed by the police. (Id. ¶ 7.) Petitioner did not call Ducksworth or Marsh at the evidentiary hearing, and the state MAR judge therefore gave the affidavits minimal weight, noting that those individuals had not been presented at the evidentiary hearing for cross-examination or made available so the court could judge their credibility. The original evidence from the police reports and the trial reflects that at the time of the murder in 2003, Ms. Ducksworth called police at 7:08 am when she saw the body, and reported that she had heard gunshots between 5:00 a.m. and 5:30 a.m.; the related death investigation report lists the apparent time of death as 5:00 a.m. (Petition, Ex. 1 [Doc. #1-2 at 2].)

6

Petitioner also presented an affidavit from a private investigator, Larry C. Upchurch. He visited the murder scene on July 19, 2010, seven years after the murder, for several hours and took pictures of the scene at 5:00 a.m. (Ex. 18 [Doc. #18-4 at 13]), at 6:00 a.m. (Ex. 19, [Doc. #18-4 at 14]), and at 7:00 a.m. (Ex. 20 [Doc. #18-4 at 15]). (Petitioner's Motion to Amend, Ex. 17 [Doc. #18-4 at 10-12], Upchurch Aff. ¶¶ 4-11.)[1] In sum, he stated that although it went from dark to light during that time, it was his opinion that at no point could he have identified a person standing where the body was found while he was near Davis' alleged vantage point at the time of the shooting. (Id.) However, he was not presented as a witness at the state MAR evidentiary hearing. Petitioner instead presented the testimony of Investigator Hunter, as well as a video of the crime scene taken by Hunter in 2019, sometime between 3:00 a.m. and 4:15 a.m. (Petition, Ex. 14, MAR Tr. [Doc. #1-15 at 90-91]; Ex. 18 [Doc. #1-19] filed manually.) The state MAR court did not admit or allow any opinions by Hunter because he was not qualified as an expert, had not prepared a report or been identified as an expert, and had not complied with the State's reciprocal discovery order. Petitioner did present one expert witness, Jon Megerian, an attorney who testified to the standard of care, specifically that counsel in a murder case should investigate the crime scene in similar circumstances as the time of the crime. He also opined that trial counsel should have visited

---

[1] Petitioner also submitted a picture described as being taken "on July 19, 2010 at 5 am," (Petition, Ex. 17 [Doc. #1-18 at 1]), but the picture itself is captioned as "Picture taken of scene at 4 am on July 19, 2010" (Id. [Doc. #1-18 at 2]). That appears to be the same picture attached to the Upchurch affidavit as being taking at 5:00 a.m. [Doc. #18-4 at 11, 13], and the Court notes the inconsistency in the time stamps but has considered the picture as described and attached to the Upchurch affidavit.

7

the scene in the dark because Davis could not have seen what he claimed to have seen at night. (Petition, Ex. 14 [Doc. #1-15 at 42-43].)[2]

In the order denying the Motion for Appropriate Relief, the state trial court noted that the defense did not subpoena Petitioner's former attorney to testify. (Id., Ex. 13 [Doc. #1-14], Findings of Fact ¶ 66.) As noted above, that court also gave "minimal weight" to the affidavits concerning the timeline of the murder because Petitioner did not call those witnesses to allow for cross-examination or an opportunity for the Court to assess their credibility. (Id. ¶ 67.) Regarding the issue of trial counsel visiting the crime scene, the state court cited a number of instances in the trial transcript reflecting that trial counsel "demonstrated substantial familiarity of the immediate crime scene and the attendant neighborhood" and with the "positions of persons alleged to have been at the crime scene, including the relationship between each of those persons, including the victim, and buildings and structures on and about the crime scene." (Id. ¶ 68(a), (b).) The state court found that Petitioner's expert witness at the MAR hearing, Attorney Megerian, was "an expert in criminal defense" and was "thorough and compelling," but the state court nevertheless rejected Mr. Megerian's opinion that Petitioner's trial counsel was ineffective in the preparation of the defense and during trial. (Id. ¶ 29-35.) The state court noted that Petitioner had not presented any evidence regarding the timeline of the murder, to support Mr. Megerian's opinion. (Id. ¶ 31-33.) The state court also described the effective work by Petitioner's trial counsel, including trial counsel's substantial familiarity with the scene and the neighborhood and the positions of the various individuals

---

[2] In his testimony before the MAR court, Mr. Megerian did make assertions that trial counsel did not visit the scene "before dawn or at night," but Mr. Megerian admitted that he had not spoken with trial counsel about the case, and the State MAR court sustained the State's objection to the expert's factual assertions without sufficient basis. (Petition, Ex. 14, MAR Tr. [Doc. #1-15 at 35, 64].)

at the scene. (Id. ¶ 68.) In the end, the state court found that trial counsel's "performance did not fall below an objective standard of reasonableness for skilled and experienced trial counsel defending one charged with first degree murder and related property crimes" and specifically that "counsel was not ineffective in failing to adequately investigate or in failing to effectively cross-examine witnesses as alleged in [the] Motion for Appropriate Relief." (Id. ¶ 70, Conclusions of Law ¶ 4.)

Petitioner now contends that the state court's conclusion that counsel acted within the objective standard for reasonableness is an unreasonable application of federal law concerning ineffective assistance of counsel because counsel failed to sufficiently investigate the crime, particularly the scene of the murder. There are multiple problems with this argument. First, it appears undisputed that Petitioner's trial counsel did in fact visit the crime scene, interview witnesses, and undertake an investigation. As noted by the MAR court, trial counsel "demonstrated substantial familiarity of the immediate crime scene and the attendant neighborhood" and also with the "positions of persons alleged to have been at the crime scene, including the relationship between each of those persons, including the victim, and buildings and structures on and about the crime scene." Thus, this is simply not a case where trial counsel made strategic decisions without undertaking any investigation or without visiting the crime scene.

Second, the only real contention by Petitioner is that trial counsel failed to properly investigate the crime scene because he did not visit the scene *at the relevant time of day*. However, as Respondent points out, Petitioner introduced no evidence at the Motion for Appropriate Relief hearing as to the time of day that his trial counsel visited the scene of the murder.

9

(Respondent's Brief [Doc. #12 at 9-11].) As specifically discussed during the evidentiary hearing before the MAR court, Petitioner did not submit an affidavit from trial counsel or call trial counsel to testify at the evidentiary hearing on the MAR, creating what the MAR court described as a "conspicuous absence, a vacuum, in the testimony." (Petition, Ex. 14, MAR Tr. [Doc. #1-15 at 179].) Thus, there is no competent evidence of what investigation trial counsel did or why he did it. Given this "vacuum", there is no actual evidence as to when counsel visited the crime scene, nor is there any basis to conclude that trial counsel's determination not to present evidence regarding the scene was anything other than a strategic decision.

Third, even if trial counsel did not visit the scene during the relevant early morning hours, Petitioner's primary contention is that trial counsel should have visited the scene "in the dark," but there is scant evidence in the record that the shooting actually occurred in the dark or under the conditions suggested by Petitioner. The evidence in the police reports reflects that Ms. Ducksworth called police at 7:08 a.m., and based on the information she provided, the report lists the time of death at 5:00 a.m. At the state MAR hearing, counsel noted that Ms. Ducksworth reported hearing gunshots between 5:00 a.m. to 5:30 a.m.[3] With regard to the trial testimony regarding the timing of the murder, the State's chief witness against Petitioner, Tyrone Davis, did not provide a specific time but indicated that it was "dark coming to light" and "coming towards day," with a time of "probably" sometime just before

---

[3] As discussed above, Petitioner presented to the MAR court an affidavit from Ms. Ducksworth opining that the time was even earlier, but the state MAR court specifically gave that minimal weight because Ms. Ducksworth was not called as a witness at the evidentiary hearing and was not subjected to cross examination or credibility assessment.

sunrise, which was at 6:15 a.m.  (Petition, Ex. 8 [Doc. #1-9 at 57-58].)  First light, or twilight, would have begun during the 5:00 a.m. to 6:00 a.m. window, which is consistent with the testimony that it was "dark coming to light" and "coming towards day."  Police reports similarly reflect that Davis told officers that there "wasn't that much sun out there, but there was some sun out there . . . so [he] could see."  (Petition, Ex. 5 [Doc. #1-6 at 29].)  None of these statements would have compelled defense counsel to visit the murder scene in darkness as Petitioner maintains he should have.  Moreover, Petitioner has presented very limited evidence regarding the conditions during the relevant time.  The evidence submitted by Petitioner at the state MAR hearing included a video taken by Investigator Hunter, and Hunter testified that he arrived at the scene at 3:00 a.m. and left at approximately 4:15 or 4:30 a.m., to try to observe and video the conditions at the time of the shooting (albeit many years later). (Petition, Ex. 14, MAR Tr. [Doc. #1-15 at 90-91].)  However, the timing used by Hunter does not align with any of the trial testimony, and Petitioner has not shown how the investigator's video – in potentially darker conditions one to three hours before the relevant time – provides any basis to conclude that trial counsel was ineffective for failing to visit the scene at some other time.[4]

Thus, as it relates to the present claim, Petitioner has not established when trial counsel did or did not visit the scene or that trial counsel's conduct reflected anything other than strategic decisions.  Moreover, even if trial counsel did not visit in "the dark" as Petitioner

---

[4] At the MAR hearing, Petitioner's expert Mr. Megerian confirmed that they went to the scene at 4:00 in the morning, even though Dorothy Duckworth told the officers that the shots were fired between 5:00 and 5:30, because they "wanted to be sure we were there when it was dark" even if it was an hour before when Ms. Duckworth told officers the shots occurred.  (Petition, Ex. 14, MAR Tr. [Doc. #1-15 at 51-52]).

11

contends, there is no basis to conclude that trial counsel was ineffective for failing to visit the scene at 3:00 a.m. or 4:00 a.m. in the dark, when all of the evidence reflected that the murder occurred between one and three hours later, as it was "coming towards day" and in different conditions than Petitioner now suggests. Given this record, the state court's conclusion that counsel did not fail to meet an objective standard of reasonableness in representing Petitioner was not an unreasonable interpretation of federal law as established by the Supreme Court in Strickland and Wiggins.

In addition, even though the state court denied Petitioner's ineffective assistance claim on the first prong of Strickland, Petitioner's claim would also fail in this Court because he cannot show prejudice. First, Petitioner does not demonstrate how counsel could have placed evidence regarding the nature of the crime scene in total darkness before the jury. As discussed above, the evidence at trial reflected that according to Davis, the shooting was "probably" before 6:00 a.m. (with sunrise being at 6:15 a.m. that day), and that it was "coming to light." (Petition, Ex. 8 [Doc. #1-9 at 57-58].) He also stated that it was "early morning" and that lights at the nearby church meant that "you pretty much can see . . . what's going on." (Id. at 18.) Petitioner points to no testimony at trial that the shooting occurred in near or total darkness or at the time Petitioner's investigator visited the scene and took video. Therefore, Petitioner has not shown how counsel, even had he visited the crime scene in darkness to collect evidence, could have introduced that evidence concerning the conditions of the scene when it was dark. Moreover, submission of such evidence would have given up the advantage of final argument that the MAR court found significant. (Petition, Ex. 13 [Doc. #1-14] ¶ 68(k).)

12

Second, Petitioner relies on the video filmed by Investigator Hunter in the dark near the scene of the murder. (Id., Ex. 18 [Doc. #1-19].) As noted above, that video was taken between 3:00 a.m. and 4:00 a.m., an hour or more before the shooting based on the evidence at trial. Thus, it is not clear that the video accurately depicts the scene at the time of the shooting. Moreover, even if that video is considered and could have been admitted, many details around the scene are actually visible and well lighted. Based on the video, there is no reason that a witness such as Davis could not identify a vehicle or person who he knew well and expected to be present in the area. Moreover, the 2010 pictures by Investigator Upchurch at 5:00 a.m. and 6:00 a.m. reflect a significant amount of early morning light, and also show lighting from the church and nearby lights consistent with Davis's testimony.[5] Therefore, any such evidence would have been of questionable help to Petitioner's case even if presented at trial. In the end, Petitioner cannot demonstrate the prejudice required to succeed on an ineffective assistance claim in this Court. His claim that counsel failed to properly investigate the crime scene fails for this additional reason.

Petitioner's other contention is that counsel failed to properly investigate the fact that the victim in the case did not look like Joe Milton, a person with whom Petitioner had a history of violent incidents. Petitioner contends that Milton did not look like the decedent, Willie Johnson, and that demonstrating this to the jury would have undermined the State's theory for motive which was that Petitioner mistook Johnson for Milton. This claim also fails for

---

[5] As noted by Respondent, Davis also had additional context for identifying Petitioner, including based on the vehicle he got out of (which Davis had recently been riding in with Petitioner in the area), (Petition, Ex. 8 [Doc. #1-9 at 14, 17]), and based on Petitioner's clothing of black shorts, Air Force One shoes, and a long sleeve Nautica t-shirt (which Davis had seen Petitioner wearing that evening) (Petition, Ex. 5 [Doc. #1-6 at 28], Ex. 3 [Doc. #1-4 at 14-15]).

two reasons.  First, during his cross-examination of Davis, trial counsel established that Davis was well acquainted with Joe Milton and his associates who had fought with Petitioner in the past.  (Id., Ex. 8 [Doc. #1-9 at 47-48].)  He then showed Davis a picture of Johnson that had been used by the State and asked Davis whether he looked like Joe Milton.  Davis plainly stated that he did not.  (Id.)  Therefore, counsel was able to establish for the jury that Johnson did not look like Joe Milton, and he was able to do so without introducing defense evidence and losing his right to the final closing argument.  There would have been no reason for him to further delve into Johnson's lack of resemblance to Milton or to present cumulative evidence of that fact to the jury.  As with Petitioner's earlier contention regarding investigating the crime scene during the dark, the state court's determination that counsel acted within objectively reasonable standards for a defense attorney on this point was not an unreasonable interpretation of established Supreme Court precedent.  Further, Petitioner cannot establish his claim of ineffective assistance of counsel in this Court in any event because he cannot show that he was prejudiced by a lack of cumulative evidence on a point clearly established to the jury at trial.  Petitioner's claims fail, Respondent's Motion for Summary Judgment should be granted, and Petitioner's Cross Motion, as amended, should be denied.[6]

---

[6] As part of the state MAR, Petitioner also presented the testimony of Stephon Walker, who Davis identified as driving the vehicle during the shooting.  Walker denied any involvement and denied that he was ever in the same vehicle as Petitioner.  (Petition, Ex. 14 [Doc. #1-15 at 130-32].)  However, the state MAR court concluded that this was not new evidence because it was consistent with Walker's statements to officers and available at the time of trial.  (Petitioner, Ex. 14 [Doc. #1-15 at 155].)  Notably, according to the police reports provided with the Petition, another individual who was with Walker that morning, George Smart, told officers that just after the shooting, Walker drove him to Walkertown, and on the way there, Walker told Smart that they had "gotten someone."  (Petition, Ex. 3 [Doc. #1-4 at 31-32].)  Smart asked what he meant, and Walker said "Jerome got somebody."  Smart told officers that Walker explained that Petitioner was arguing with someone over weed, and Petitioner "got him."  Officers asked Smart specifically what Walker told him happened, and Smart replied, "He shot him."  (Petition, Ex. 3 [Doc. #1-4 at 32].)  Smart also told officers that Walker had spoken to him later and wanted Smart to go to court with him and say they were together the entire time.  Smart told officers that they were not together the entire time, and that Walker wanted Smart to lie for him.  (Petition, Ex. 3 [Doc. #1-

14

IT IS THEREFORE ORDERED that Petitioner's Motion [Doc. #18] to amend his Cross Motion for Summary Judgment is granted.

IT IS THEREFORE RECOMMENDED that Respondent's Motion for Summary Judgment [Doc. #11] be granted, that Petitioner's Cross Motion for Summary Judgment [Doc. #16] be denied, that the Petition [Doc. #1] be denied, that this action be dismissed, and that, there being no substantial issue for appeal concerning the denial of a constitutional right affecting the conviction nor a debatable procedural ruling, a certificate of appealability not issue.

This, the 22nd day of August, 2022.

　　　/s/ Joi Elizabeth Peake　　　
United States Magistrate Judge

---

4 at 33].)  In addition, a neighbor, Mr. Carpenter, specifically identified Petitioner, Davis, and Walker as the three individuals who got into the green Ford Explorer together, which is consistent with Davis's account and directly contradicts Walker's assertion that he and Petitioner were never in the same vehicle. (Petition, Ex. 3 [Doc. #1-4 at 47]; Resp. Br. [Doc. #12-14 at 18-19].)  Walker was facing charges at the time of Petitioner's trial, and eventually pled guilty to involuntary manslaughter. (Petition, Ex. 14 [Doc. #1-15 at 133-34].)  Given the evidence that could have been used to challenge Walker's credibility, there does not appear to be any basis for a claim of ineffective assistance of counsel related to Walker, nor does there appear to be an effort to raise such a claim as part of the present Petition.